Filed 10/21/20  In re J.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.R. et al., Persons Coming Under the Juvenile Court Law. | B305446 (Los Angeles County Super. Ct. Nos. 19CCJP08212A; 19CCJP08212B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.R.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

10-year old Jayden R. and his five-year-old half-brother, Abraham R. are the sons of appellant, B.R. (Mother).[1]  Mother has acknowledged she is an alcoholic, and the year before this dependency action was filed enrolled in a treatment program.  However, she dropped out of the program and resumed drinking after about four months of sobriety.  Mother concedes that she becomes aggressive when she drinks alcohol and, at least once, has blacked out while drinking.  Both boys have been present during incidents of domestic violence between Mother and Abraham's father, Marco R.-P. (Marco) in which one or the other parent's alcohol abuse played a substantial role.

Mother contends there is insufficient evidence to sustain a juvenile court jurisdictional finding that her history of and ongoing alcohol abuse presented a substantial risk of serious harm to her sons.  We conclude otherwise and affirm.

## PROCEDURAL BACKGROUND

On December 24, 2019, respondent Department of Children and Family Services (DCFS) filed a petition, pursuant to Welfare and Institutions Code section 300,[2] subdivisions (a), (b) and (j), on behalf of Jayden and Abraham.  Counts a-1, b-1 and j-1 alleged that dependency court jurisdiction should be asserted because of Mother's and Marco's

---

[1]    The boys have different fathers, neither of whom is a party to this appeal.

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

2

history of engaging in domestic violence in the children's presence. Only count b-2 was sustained. It alleged: "[Mother] has history of alcohol abuse and is a current abuser of alcohol. . . . On prior occasions, [Mother] was under the influence of alcohol while the children were in [her] care and supervision. . . . Abraham is of such young age requiring constant care and supervision and [Mother]'s alcohol [*sic*] interferes with [her] ability to provide regular care and appropriate supervision of the children. [Mother]'s alcohol [*sic*] endangers the children's physical health and safety and places the child [*sic*] at risk of serious physical harm, damage and danger."

At a detention hearing on December 26, 2019, the juvenile court found DCFS had established a prima facie case that the boys were children described by section 300. Jayden was released to Mother's care, and Abraham into the care of both his parents.

At the combined adjudication/disposition hearing which began February 18 and concluded on March 9, 2020, the court sustained count b-2 and dismissed the others.[3] Proceeding to disposition, the court declared the boys dependents of the court and entered disposition orders (home-of-parent/mother for Jayden and home-of-parents for Abraham). Mother and Marco were given joint custody of Abraham, with Marco's home as the boy's primary residence. Mother was ordered to participate in a drug/alcohol treatment program and Alcoholics Anonymous (AA), and to undergo drug testing and counseling, among

---

[3]     We discuss evidence regarding the dismissed counts regarding domestic violence between the parents where relevant to the sustained allegations.

3

other things. The court terminated jurisdiction as to Abraham, but briefly stayed that order pending receipt of a signed custody order.[4]

Mother filed a timely appeal from the jurisdictional findings and disposition orders.[5]

## FACTUAL BACKGROUND

Evidence at the adjudication hearing established the following.

DCFS received a referral in mid-November 2019 that Marco had tried to break into Mother's home while Abraham was present. Mother was elsewhere when Marco called to say he was at her house to drop off Abraham. When Mother said she would be home in two minutes, Marco threatened to break into the house through a window. Mother called the police. When Mother arrived home, she found Marco and Abraham outside. Officers who arrived later observed a bent window screen.

---

[4] We take judicial notice of the court's March 11, 2020 minute order releasing Abraham to his parents' custody and terminating dependency court jurisdiction. (Evid. Code, §§ 459, subd. (a) [reviewing court may take judicial notice of any matter specified in Evid. Code, § 452], 452, subd. (d)(1) [judicial notice may be taken of "[r]ecords of (1) any court of this state"].) The termination of dependency court jurisdiction as to Abraham does not render this appeal moot as to him. (See *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548 ["The fact that the dependency action has been dismissed should not preclude review of a significant basis for the assertion of jurisdiction where exercise of that jurisdiction has resulted in orders which continue to adversely affect appellant. If the jurisdictional basis for [the court's disposition] . . . is found by direct appeal to be faulty, the [disposition] order[] would be invalid"].)

[5] Mother does not take issue with the dispositional orders on appeal.

4

Abraham said Marco "tried to go in" but had not entered Mother's house.

A DCFS social worker visited Mother's home. The home appeared in order, and Mother did not appear to be under the influence of any substance. Mother said she had been involved in five incidents of domestic violence with Marco, most recently on May 26, 2019, and Abraham was present. She said Jayden also had witnessed at least two incidents of domestic violence between her and Marco. The parents' arguments revolved largely around finances, Mother's alcohol consumption, and Mother's brother living at the house.

After one incident of domestic violence in February 2016, Marco called the police. The parents had been drinking alcohol the evening before and Mother continued drinking the next day. They argued and Mother tried to punch Marco. Abraham was asleep in an adjacent bedroom during the argument. The most recent incident of domestic violence occurred in May 2019. Marco had spent the weekend with Mother and the children, and the parents argued because Mother had no energy to do anything. Marco believed Mother might be "coming down from something," and asked if she had been drinking or using drugs. Mother had become defensive, which led to a physical altercation.

Mother also revealed an incident in March 2018 during which she and her brother (an alcoholic) were drinking and got into a physical altercation. When Mother awoke the next day, she was injured, but had no recollection of how she had been hurt. That incident led Mother to

5

decide she needed to stop drinking, and she entered an outpatient treatment program. She sought treatment through Kaiser in March 2018, and was "prescribed a pill to treat her alcoholism" that made her feel sick if she drank. She dropped out of this treatment program when she lost her job and health insurance.[6] Mother admitted "[she was] an alcoholic," but said she had begun attending AA meetings in order "to get [Marco] and her parents 'off her back.'" Mother conceded that she got aggressive when she was drinking, and that alcoholism ran in her family—her brother and both maternal grandparents were or had been alcoholics. Mother remained sober for about 120 days before relapsing. Her alcohol consumption increased after her relationship with Marco ended. Mother claimed now she only had a drink at dinner or drank socially with friends when Abraham was with Marco. Mother no longer believed she had a drinking problem. She drank to unwind, not get drunk.

The social worker interviewed Jayden who said Marco was "sometimes not really safe." Jayden had witnessed as many as four fights between Mother and Marco when he lived with them, during which they screamed at and punched one another. Jayden told DCFS that Mother and Marco saw him crying when they fought but did not stop fighting or do anything to comfort him. Both Jayden and Abraham saw Mother engage in a drunken argument with their uncle at

---

[6] Compounding her problems with alcohol, Mother had a troubled mental health history. She attempted suicide in 2013, after which she checked herself into a psychiatric hospital. Mother saw a therapist in 2016 and, in 2018, took antidepressants for an unspecified time.

Abraham's fourth birthday party just a few months before they were interviewed by DCFS. Jayden told the social worker he saw Mother drink alcohol occasionally but expressed no concern that she abused alcohol.

In 2017 Jayden began living at his maternal grandparents' (MGPs') house weekdays and saw Mother only on weekends. He had been afraid and struggled to sleep at Mother's house. Jayden felt safe at his MGPs' house which, unlike Mother's house, was not dark and did not have scary noises. Jayden felt safest seeing Mother on weekends. He met weekly with a therapist to address anxiety the therapist said was triggered by arguments and loud noises. He suffered from Generalized Anxiety Disorder, which his therapist attributed to exposure to domestic violence in Mother's home. Jayden performed well in school and Mother participated in school functions. Abraham was too young to attend school. Both boys' medical care was current.

Abraham gave contradictory information to the social worker, saying on different occasions both that he had and had not seen Mother and Marco argue. He denied seeing them engage in physical violence. Abraham had seen Mother drink, but not Marco. Abraham was not sure how much Mother drank, but had noticed she recently had begun to drink less. He felt safe in each of his parent's homes.

DCFS interviewed the children's maternal grandmother (MGM) and Marco. MGM reported that Mother drank alcohol heavily and seemed angry until about six months earlier. MGM did not know if Mother abused alcohol, but knew she had participated in a "detox

program" about three years before and had stopped drinking completely for a time. MGM saw Mother and Marco argue during a visit to their home when Abraham was about 12 months old. Mother had been intoxicated. MGM also told DCFS Mother had smelled of alcohol during a parent conference about two years earlier. MGM believed Mother had "some issues," but that she was able to protect her sons.

Marco told DCFS Mother had abused alcohol when they lived together. He confirmed that Mother engaged in a drunken physical altercation with her brother in Abraham's presence. Marco said Mother lost her job due to complications surrounding her substance use and the violent incident with her brother. He also said Mother had been using methamphetamines when they met in 2012 and in 2015, during a prior DCFS investigation of the family.[7] He did not believe she still used that drug or that Abraham was unsafe in her care. Marco believed Abraham would tell him if he had concerns, but also knew Abraham had sometimes withheld information from him in an effort to prevent or minimize conflict between his parents.

Marco told DCFS Mother had been sober while pregnant with Abraham but resumed drinking after his birth. Marco would return from work to find half-empty (40-ounce) bottles of beer. Marco did not believe Mother was an alcoholic, but thought she had an "addictive personality," meaning, when something gave her joy "she want[ed] to

---

[7] The prior DCFS investigation arose from a February 2014 referral alleging Marco put Jayden in the closet to punish him and slapped the child on his head and buttocks. The family agreed to participate in services and the referral was deemed unfounded.

[continue] doing it at any cost." Marco had been concerned about Mother's alcohol consumption during their relationship because of her and her family's history. He also said, however, that he never saw Mother intoxicated and believed she met the boys' needs. Marco's relationship with Mother ended after an incident of domestic violence in 2016.

Mother refused DCFS's three requests for her to take a drug test. The first request to test, in mid-December 2019, was refused because Mother remained on probation at her new job and could not take time off. She also claimed work prevented her from testing on December 21, 2019 and February 7, 2020. As to DCFS's February 2020 request, Mother conceded she refused to take a drug test because she knew she would "be positive." She said it had been her "kid free week," and she drank alcohol on a date. Mother drank socially but no longer believed she had a drinking problem. DCFS also reported that Mother said she smoked marijuana because she suffered from anxiety, was "stresse[d] over everything" and the drug helped her calm down. She only used the drug when Abraham was with his father. She returned to "being a mom" once Marco returned the child to her care. In March 2020, Mother denied telling DCFS she smoked marijuana.

Mother's 2018 medical records revealed she had been diagnosed with Severe Alcohol Use Disorder, Major Depressive Disorder and Generalized Anxiety Disorder, and participated in a substance abuse treatment program. She had been prescribed an antidepressant, medication for her alcoholism, and a sedative to reduce symptoms of

alcohol dependence. At the hearing, Mother acknowledged seeking medical treatment two years earlier, when she received prescriptions for antidepressants and medication to help with symptoms of alcohol withdrawal. However, Mother testified at the adjudication hearing that she no longer had an "alcohol problem." Previously, she had feared her drinking was or could become a serious issue. As a result, she participated in a treatment program, but dropped out when she lost her job and insurance. She had attended AA, but never took the "big step" of obtaining a sponsor and completed only five of the program's 12 steps. She still went to AA meetings when she had time. At the time of the hearing, Mother testified she would have a drink at dinner or when she was with friends. Mother denied drinking when the boys were in her care.

At the conclusion of the hearing, the juvenile court expressed an ongoing concern regarding Mother's history of alcohol abuse and ongoing use of alcohol and other substances. The court observed that Mother minimized her alcohol abuse, notwithstanding having acknowledged she was an alcoholic. Despite that acknowledgement, Mother continued to consume alcohol. She also failed to complete a substance abuse treatment or 12-step program, did not have a sponsor, and refused every request by DCFS for a drug test. Further, Mother admitted she tended to get aggressive when she drank, a circumstance the court found triggered her history of domestic violence. The court observed it was not required to wait until the boys actually suffered an injury to assert dependency jurisdiction over them.

10

**DISCUSSION**

Mother contends DCFS presented insufficient evidence to establish that her conduct placed her sons at risk of physical and emotional harm. She is mistaken.

I. *Controlling Legal Principles and the Standard of Review*

Section 300, subdivision (b)(1), provides a basis for juvenile court jurisdiction if a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . or substance abuse." (§ 300, subd. (b)(1).)

"'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.] 'Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300' at the jurisdiction hearing. [Citation.]'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) The focus is on averting harm to the child. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; see § 300.2.)

"The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) An unresolved substance abuse problem can compromise a

11

parent's "ability to care for [her] child, thus justifying the assumption of jurisdiction." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) Although mother makes no age-specific distinctions between the harm posed to each of her sons by her substance use, this rule is particularly true with respect to Abraham, who was only five years old at the time of adjudication. For "children of such tender years . . . the absence of adequate supervision and care poses an inherent risk to their physical health and safety." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 (*Rocco M.*), disapproved on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 627–630 (*R.T.*); accord *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219 (*Christopher R.*) [a child of "tender years" includes those six years old or younger].) A current risk of harm may be shown by evidence of past conduct, if it is reasonable to believe the harmful conduct will recur. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394 (*Savannah M.*), disapproved on other grounds by *R.T., supra,* 3 Cal.5th at pp. 627–630; *In re N.M.* (2011) 197 Cal.App.4th 159, 165 (*N.M.*) [juvenile court "may consider past events in deciding whether a child presently needs the court's protection"].) If a child is deemed to be at risk, the court need not wait until he actually suffers harm to assert jurisdiction. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) The statute requires only a showing of a "'substantial risk' that the child will be abused or neglected." (*Ibid.*) A judicial finding that a parent is a substance abuser serves as prima facie evidence "of the inability of a parent . . . to provide regular care resulting in a substantial risk of

12

physical harm." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 767 (*Drake M.*).)

"'In reviewing the jurisdictional findings . . . we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*R.T., supra,* 3 Cal.5th at p. 633.)

"'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; *see In re D.C.* (2015) 243 Cal.App.4th 41, 52.) But substantial evidence is not synonymous with any evidence, and a decision supported by no more than a scintilla of evidence need not be affirmed on appeal. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) Inferences may constitute substantial evidence if they are the product of logic and reason. Speculation or conjecture alone do not constitute substantial evidence. (*In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093; *In re A.E.* (2014) 228 Cal.App.4th 820, 826.) "'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" (*Savannah M., supra,* 131 Cal.App.4th at p. 1394; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

The burden is on appellant to show there is insufficient evidence to support the jurisdictional findings.  On review, we do not reweigh the evidence or exercise independent judgment, but simply determine whether there are sufficient facts to support the juvenile court's findings.  (*I.J., supra*, 56 Cal.4th at p. 773; see *In re S.R.* (2020) 48 Cal.App.5th 204, 219.)  Our role is to determine whether "a reasonable trier of fact could have found for the respondent based on the whole record."  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633, italics omitted.)

## II. *The Court's Jurisdictional Findings are Supported by Substantial Evidence*

To establish jurisdiction under section 300 based on the ground of a parent's substance abuse, DCFS must prove by a preponderance of evidence:  (1) "substance abuse by a parent . . . , (2) causation, and (3) serious physical harm to the child, or a substantial risk of such harm."  (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724–725; *I.J., supra*, 56 Cal.4th at p. 773.)  Mother maintains DCFS failed to establish these requirements.  We address them in turn.

### A. *Substance Abuse*

As a general matter, the legislature has declared, the "provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."  (§ 300.2.)  Mother insists her

ongoing use of alcohol does not qualify as substance abuse. Specifically, she contends she is not a substance abuser as defined in *Drake M., supra*, 211 Cal.App.4th at p. 765 [relying on diagnosis of "substance abuser" as defined in American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV)]; but see *Christopher R., supra,* 25 Cal.App.4th at p. 1217 [reliance on the *Drake M.* formulation provides a useful definition of substance abuser for purposes of § 300, subd. (b), but a parent need not have received a diagnosis of substance abuser or fall within specific category of the DSM-IV to be found to be a current abuser].) Here, Mother not only has acknowledged her alcoholism, but the record reveals she was diagnosed with Severe Alcohol Use Disorder.

Moreover, in making her argument that she does not meet the definition of a substance abuser, mother presents the evidence in the light most favorable to her, ignoring the standard of review which requires us to view the evidence in the light most favorable to the court's decision. (See, e.g., *I.J., supra*, 56 Cal.4th at p. 773.) For example, mother asserts that her drinking was under control by the time of the adjudication hearing. To support this claim, mother claims she limited her drinking to social occasions, and did not drink when the boys were in her care. Mother fails to acknowledge evidence that both boys had seen her inebriated and out of control (e.g., during her drunken brawl with her brother at Abraham's birthday party) fewer than six months before the adjudication hearing began. Further, Mother downplays the fact that she dropped out of a treatment program

15

after losing her insurance, and makes no effort to explain why she failed to investigate the availability of other no- or low-cost alternatives. She also ignores the fact that she stopped taking medication to address her substance abuse, minimized the negative effects of withdrawal, and failed to obtain an AA sponsor or advance beyond the fifth step in that 12-step program. She also ignores the fact that she blacked out while drinking on at least one occasion and has acknowledged she becomes aggressive when drunk. The court was not required to ignore this pertinent evidence as to whether Mother's alcohol use was sufficiently under control in determining whether jurisdiction over the boys was warranted. (See *Savannah M., supra*, 131 Cal.App.4th at p. 1394; *N.M., supra,* 197 Cal.App.4th at p. 165.)

Mother correctly observes that her mother and Marco both told DCFS they believed she could provide adequate care for her sons, although it is not clear that either of them truly understood the extent of mother's past or current drinking. No doubt the court took these facts into consideration at the jurisdictional hearing and at disposition, when it chose to continue the children's placement in her care. However, to the extent the juvenile court concluded these facts, which are indeed favorable to Mother, were outweighed by other factors, we will not substitute our judgment for the court's.

B. *Causation*

Under section 300, subdivision (b), state intervention is not warranted unless a parent has neglected her child due to an

16

enumerated factor, such as substance use, or there is a substantial risk of harm in the future. Accordingly, courts have held that a parent's use of alcohol, marijuana or other drugs, standing alone, will not generally provide a sufficient basis for dependency jurisdiction. (See, e.g., *Drake M., supra*, 211 Cal.App.4th at p. 769.) Again, framing the evidence in the light most favorable to her, Mother maintains the record does not establish a sufficient connection between her drinking and any harm or risk of harm to her sons. We disagree.

The record reflects that Jayden, in particular, was fearful and anxious due to Mother's drinking and violent behavior with Marco while intoxicated. Indeed, he was so disturbed that he feared living at Mother's house. A reasonable inference may be drawn that the court justifiably remained concerned that mother, while impaired, was not able to render the attention and care required by her children. "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2; *In re E.B.* (2010) 184 Cal.App.4th 568, 575, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We reiterate that the juvenile court need not wait until a child suffers actual harm to protect him from a perceived risk of harm. It is enough that there is a substantial likelihood the child will suffer such harm. (*I.J., supra,* 56 Cal.4th at p. 773.) Past events may be a relevant part of the court's determining that a child currently requires its protection. (*N.M., supra,* 197 Cal.App.4th at p. 165.)

17

Courts have found there is a substantial risk of harm where, as here, a child is of such tender years that an absence of adequate supervision and care poses an inherent risk to the child's physical health and safety. (*Rocco M., supra,* 1 Cal.App.4th at p. 824.) In such a case, a finding of a parent's substance abuse constitutes prima facie evidence the parent is unable to provide regular care resulting in a substantial risk of physical harm. (*Drake M., supra,* 211 Cal.App.4th at p. 766; accord *Christopher R., supra,* 225 Cal.App.4th at p. 1219 [a child of "tender years" includes those six years old or younger].)

Mother has a significant history of alcohol (and other substance) abuse. Marco told DCFS that Mother abused alcohol while they lived together through 2016, and that he feared she might still be drinking (or doing drugs) as late as May 2019. Mother concedes she becomes aggressive when she drinks. There is also evidence that Jayden continues to suffer significant negative effects from Mother's drunken aggression. The evidence establishes a causal nexus between Mother's alcohol abuse and the perceived risk of harm to the children.

## C. *Risk of Harm*

Mother strenuously argues the children have not suffered, and are not at substantial risk of suffering, serious physical harm. Risk to a child from substance abuse can be established in two ways: (1) through proof of "'an identified, specific hazard in the child's environment,'" or (2) through proof that the child is of "'tender years'"—i.e., six years old or younger—in which case a "finding of substance abuse is prima facie

18

evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*Drake M., supra*, 211 Cal.App.4th at pp. 766–767, italics omitted; *Christopher R., supra,* 225 Cal.App.4th at p. 1219.)

To show that a child faces a risk of harm at the time of the jurisdiction hearing, there "'must be some reason beyond mere speculation to believe the alleged conduct will recur.  [Citation.]' [Citation.]" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)  In determining whether conduct is likely to recur, courts may consider evidence of the parent's past behavior.  (*Savannah M., supra*, 131 Cal.App.4th at p. 1394; *N.M., supra,* 197 Cal.App.4th at p. 165.)  With regard to the second factor, Abraham is only five years old.  Although Jayden is older, the court justifiably was concerned that the fear and anxiety he suffers resulted from Mother's violent interactions with Marco, which were triggered, at least in part, by her unresolved problem with alcohol.  Accordingly, the court could conclude Jayden had a heightened need for attentive, caring supervision and the care he received from Mother was inadequate.

A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct also is relevant to determining risk under section 300. (See *In re Tania S.* (1992) 5 Cal.App.4th 728, 735, fn. 4; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision'"].)  Here, Mother denied excessive drinking or any drug use, yet repeatedly refused to

submit to drug tests, at least one of which she knew would be positive for alcohol and marijuana. Mother also denied that her drinking impaired her ability to parent, notwithstanding the anxiety and fear Jayden suffers due to Mother's alcohol-fueled fights with Marco. (*A.F.* at p. 293 [a parent's denial of responsibility is relevant in determining whether the parent's conduct is likely to recur in the future].)

Despite her disease, Mother minimized the severity of her alcoholism, which remained unresolved and, to date, she has demonstrated only an ability to remain sober for a few months. Mother is not concerned about her alcohol consumption. Indeed, she told DCFS she began attending AA meetings only "to get [Marco] and her parents 'off her back.'" She never completed that program or obtained a sponsor, and currently attends meetings on a casual basis, when time permits. The court and DCFS expressed concern that mother's unresolved substance abuse problems would continue to plague her if left unaddressed. Taken together, the facts support the court's conclusion that the risk of serious harm was ongoing.

The jurisdictional findings were not premised on conjecture or speculation. The record provides sufficient support for the juvenile court's reasonable skepticism of Mother's claim to have her alcohol consumption under control. There is sufficient evidence to support a conclusion that Mother's continued alcohol consumption posed a substantial risk of serious harm to her children, and that issue remained unresolved at the time of adjudication. We do not intend to diminish efforts mother has made to address her alcoholism. Rather,

20

we conclude only that the court's exercise of dependency jurisdiction was not erroneous.

## DISPOSITION

The jurisdictional findings and orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.